IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 8, 2021

## MAURICO GRANDBERRY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 10-01780          Jennifer Johnson Mitchell, Judge

_____

### No. W2020-00734-CCA-R3-PC

_____

The petitioner, Maurico Grandberry, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel at trial.  Following our review, we affirm the post-conviction court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

Joseph McClusky, Memphis, Tennessee, for the appellant, Maurico Grandberry.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### *Facts and Procedural History*

### I.    *Trial Proceedings*

In a joint trial, a Shelby County jury convicted the petitioner, Maurico Grandberry, and his co-defendant, Calvin Person, of first-degree, felony murder. *State v. Calvin Person*, No. W2011-02682-CCA-R3-CD, 2013 WL 5883796, at *1 (Tenn. Crim. App. Oct. 31, 2013), *perm. app. denied* (Tenn. March 5, 2014).  The trial court sentenced the petitioner

to life imprisonment, and he appealed. *Id.* This Court summarized the evidence produced at trial, as follows:[1]

LaShawn Blades testified that she lived in a duplex next to the duplex occupied by Free Baptist Strickland ("the victim"). She knew [the co-defendant] because she was dating [the co-defendant's] cousin, Tyrone, at the time of the incident. She also knew [the petitioner], whom she referred to as "Tutu." She stated that she spent time with all of these individuals because they all lived in the same neighborhood. According to Blades, the victim sold powder cocaine as his source of livelihood.

Approximately one week before the victim died, Blades was in her house and overheard the [d]efendants on the porch. She testified, "Tutu said that he wanted to kill Free. And his words was, man, I'm going to kill that bitch. And [the co-defendant] says, no, man. We just going to rob that n* * * *r, you know. I'm just saying how, you know. And Tutu like, man, no." Soon after, [the petitioner] left, and the victim drove up. Blades told the victim what [the petitioner] had said, and he responded, "[C]uz, I'm going to be all right, you know."

[The petitioner] then returned to Blades' residence, "ran up and hit [her] door," and said, "Bitch, you next." Blades stated, "I knew he meant that because [he] knew that I had told [the victim] what he said."

. . . .

[Blades] learned about the victim's death from a man named Mr. LeMont, who had called her to find out what was going on. When she arrived home, many people from the neighborhood were outside, as well as police officers. The next day, Blades called the police and reported that she thought she knew who killed the victim. Later that day, the police picked her up and took her to the homicide office. They also brought her to the office a second time two days later, and it was not until this occasion that she gave a formal statement. She identified pictures of both [d]efendants as well as another individual, Falantis. Next to Falantis' picture was her written description, "This is Falantis. I know him from being with [the petitioner]. Officer Wells arrested him yesterday." She agreed that Falantis was from the same neighborhood and that she had seen him with [the petitioner] regularly.

---

[1] The proof presented at trial and this Court's summary of the same was extensive. Thus, we have only included the portions of our prior summary which are relevant to the issues on appeal.

According to Blades, she told police that [the petitioner] had killed the victim and that [the co-defendant] had robbed him, based on their discussion she had overheard on her porch. She heard [the petitioner] say the same thing seven times over the course of five days. She reiterated that every time [the petitioner] said that he wanted to kill the victim, [the co-defendant] would say, "[N]o, man, we're going to rob him."

Blades acknowledged that, in her statement on April 28, 2009, she told police, "I know in my heart that [the petitioner] and Falantis killed [the victim]." She explained that she had believed Falantis was involved based on what she had heard from other people. But in her original discussion with police on April 26, 2009, she had not yet heard about Falantis and, accordingly, did not tell police that he was involved.

Blades also acknowledged that she was convicted of forgery in 2004. On redirect examination, she stated that Falantis was never with the [d]efendants when they discussed robbing and killing the victim.

Officer Lamarcus Webb with the Memphis Police Department ("MPD") testified that he was on patrol on April 25, 2009. He responded to the scene after receiving a call over the radio regarding a shooting. He and his partner were the first law enforcement officers to arrive, and, soon after their arrival, they found the victim in the backyard of a residence. The victim appeared to be dead when they first saw him. Officer Webb noticed that the victim "was pretty bloody" and that the victim's "pockets were turned inside out."

Bessie Beal, another neighbor of the victim, testified that she had known the victim approximately one year. She grew up with [the co-defendant] and knew [the petitioner] through her son. On the day that the victim died, he had been at her home at approximately 8:30 p.m. She also had seen the [d]efendants earlier that day.

While the victim was at her home, he received a call from an individual named "Dray" wanting a "pack of powder," which she said was cocaine. Bessie stated that the victim left and walked four houses down the road. She explained that the victim would go behind the abandoned house because that was where he kept "his product." She continued,

> So after he got down there, Dray pulled up and he went
> on back behind the house, whatever he do, and he came back

- 3 -

out. And I'd say about a half second – I'd say about three minutes Dray pulled off. He got halfway down the street and heard a gunshot, so I snatched my daughter and we ran in the house. . . .

And I ran back out and I'm like -- well, I'm looking. . . . Didn't see [the victim], so I called his phone. No answer.

[The co-defendant] had been at her home earlier that day, and he asked her about a black jacket at her house.

On cross-examination, Bessie acknowledged that she "shared the same profession" as the victim but that they were friends and not rivals. She could not remember what [the co-defendant] was wearing that morning. When she heard the gunshots, three other men also were standing in her yard with her.

Wendolyn Beal testified that on the day the victim was killed she was living with Bessie. She recalled that [the co-defendant] had been at their house earlier in the day. Later, after hearing the gunshot, Wendolyn went behind the vacant house and observed the victim "laying flat on his back" and "[i]n a pool of blood." As she ran away, she saw an undercover police officer and flagged him down.

On cross-examination, Wendolyn stated that it was dark enough behind the vacant house that she "couldn't see [her] hand." She observed [the co-defendant] at some point that day walking down the street with a black jacket under his arm.

Kimberly Perry, another neighbor of the victim, testified that she also knew the [d]efendants. On the morning that the victim was killed, she heard [the petitioner] say, "I'm going to kill that bitch ass n* * * *r." She observed [the co-defendant] at the home of her aunt, Bessie, when he retrieved her cousin's "black hoodie." Kimberly left that street at approximately 6:00 to 6:30 p.m. Despite saying so in her statement to police, she did not recall at trial seeing [the co-defendant] give the "black hoodie" to [the petitioner].

On cross-examination, Kimberly clarified that the reason she did not see an exchange of the "black hoodie" was because she walked away. That afternoon, [the petitioner] had asked her to drive him to a location "around

- 4 -

the corner" and back. She noted that he was wearing mostly black with a white shirt on the way there, and, on the way back, "he just had on all black."

Chasity Perry testified that she was [the petitioner's] girlfriend on April 25, 2009. At the time, she was living with her grandmother, and [the petitioner] came to visit her that evening sometime after 9:00 p.m. Chasity was braiding the hair of an individual named Ray Joyner at the time. She confirmed that when [the petitioner] arrived "he was shaking and [said] something to the effect that I fucked up." Initially, Chasity believed that [the petitioner] was referring to their relationship, but he was not. She also confirmed that he told her that he had been at the vacant house on Shasta Street and that "a shot rang out." Later, Chasity left with [the petitioner] and went to a hotel.

. . . .

Sergeant James T. Max with the MPD testified that he responded to the scene of the shooting on April 25, 2009. He described the front of the vacant house where the shooting occurred as well-lit but noted that the back was dark. Sergeant Max continued,

> As you go around to the back, on the southwest corner of the house was a small, covered porch area. Concrete steps -- two concrete steps leading out to the yard. At the base of that bottom step was [the victim]. He was lying in a face up position, head facing southeast. The feet -- actually his right foot was actually on the step. . . . And one of the things I noticed was that [ ]his pants pockets were turned inside out, which is an indicator to me that someone or him [sic] had taken something out in a hurried fashion.

Sergeant Max later learned that this home had belonged to the victim's mother before she passed away and left it to the victim. Eventually, he searched the home and found "[t]wo .40 caliber cartridge casings spent, like four beer cans, a pair of blue jeans, and a vodka bottle." He stated that "most of the furniture in the home was just thrown out in the backyard, it appeared." Sergeant Max identified a picture of the victim's left hand which had "what appears to be blood" on it. He did not recall seeing "defensive wounds" on the victim such as cuts, scratches, or scrapes. The blood on the victim's hand seemed to be from "a pool of blood that was underneath his head and shoulder when he had -- his palms were down."

. . . .

From observing the victim's face, Sergeant Max noticed a hole or wound to the victim's left chin. Additionally, he observed "a protrusion under the skin" on the back of his neck "one inch below the rear hair line and just to the right of his spine." He further explained, "It was like an entry type wound that did not exit."

On May 2, 2009, Sergeant Max responded to a call at 973 Echols because he was asked "to locate a Mr. Kinner who had possibly been in possession of a firearm that may have been used in this homicide." Kinner showed Sergeant Max and the other officers present where the gun was located under a mattress. Sergeant Max described the weapon as "a Taurus six shot revolver, .38 caliber." The gun was loaded with "five live rounds" when they found it.

. . . .

Officer Demar Wells testified that his current assignment with the MPD was in Crime Scene Investigation. He responded to the crime scene in this case on April 25, 2009. He identified two Winchester spent .40 caliber shell casings which he collected at the scene. On cross-examination, he agreed that a .40 caliber bullet could not be fired through a .38 caliber weapon because a .40 caliber bullet would be too large. . . .

Lieutenant Walter Davidson with the MPD testified that in April 2009 he was assigned to the homicide division and was involved in the present case. He and Sergeant Ragland interviewed [the petitioner] on April 26, 2009. Lieutenant Davidson identified the advice of rights form through which [the petitioner] waived his rights. From this interview, [the petitioner] told Lieutenant Davidson, "[H]e left the -- what he called the track on Shasta around 8:30, went to his girlfriend's house -- I believe her name was Chastity or Chasity . . . and spent the evening with her." Lieutenant Davidson then attempted to contact [the petitioner's] girlfriend and was unable to do so, but he was able to speak with some other individuals at her house. He stated, "[W]e talked to Chasity's grandmother I believe, and she couldn't verify what he said, as well as one of Chasity's sisters said he wasn't there." While they followed up on this information, they released [the petitioner]. Lieutenant Davidson stated that [the co-defendant] consented to giving DNA samples.

- 6 -

. . . .

Sergeant Anthony Mullins with the MPD testified that he had worked in the homicide division for the past eight years. As part of his investigation in this case, he and Sergeant Mason interviewed [the co-defendant] on May 1, 2009. He identified the advice of rights form signed by [the co-defendant], waiving his rights. From this interview, Sergeant Mullins learned the following from [the co-defendant] about the day of the shooting:

> He said he was on Shasta Street at some point during the afternoon off and on, different house back and forth talking to different people. Spent some time at Bessie's house. There was a house next door that people hung around at, but basically he spent his time right there on Shasta Street.

[The co-defendant] told Sergeant Mullins he had known the victim for approximately twelve to thirteen years. Sergeant Mullins continued, "[the co-defendant] said people call him [the co-defendant] the Lulu Man and we had to ask him what that meant. He said he would sell fake dope, fake specifically crack cocaine, soap, anything white that they could cut into small pieces and pass off as crack cocaine. He would sell that to addicts and they would call that lulus."

[The co-defendant] told Sergeant Mullins that he went inside Bessie's home to get a black hooded sweatshirt from the house. [The co-defendant] "said that as he was walking out [Bessie] asked him why he had her son's hoodie and he basically told her to mind her own business and just kept on walking." From there, [the co-defendant] walked to the vacant house located two houses down the street. Sometime later, [the co-defendant] walked to the B52 Market, approximately one-quarter-mile away, to buy some beer. After going to the market, he returned to Bessie's home. Bessie's boyfriend asked [the co-defendant] whether he heard the gunshot, and [the co-defendant] said that he did. He told Sergeant Mullins that he had seen the victim walk behind the vacant house, "which was typical for [the victim] according to everyone we had talk[ed] to. And he made the comment he was probably just doing this [sic] thing." Upon going to look for the victim after hearing the gunshot, [the co-defendant] "said he walked over toward the house and looked over a fence with someone named Terry and he saw a body back there behind the house."

- 7 -

At some point, Sergeant Mullins told [the co-defendant] that [the co-defendant] was not being truthful, and, eventually, [the co-defendant] admitted that he had not told the truth regarding his version of the events. [The co-defendant] then admitted that he was present when the victim was shot. He told the officers that he was in the front of the vacant house when the shooting occurred and that the victim was shot in the backyard. Although [the co-defendant] did not see the victim get shot, he stated that he heard only one gunshot and that the weapon used was a .38 revolver. He explained that he was in the house "to see where [the victim] hid his dope and to take his dope and take his money. Rob him of his dope and money." [The co-defendant] had been waiting in the house for the victim for approximately forty-five minutes to an hour. He told the officers that he had no problems with the victim. When [the co-defendant] heard the gunshot, he ran out through the back of the house, observed the victim lying in the yard, took some money, and fled the scene. He admitted to talking about "robbing" the victim on several occasions prior to the incident.

Sergeant Mullins testified that [the co-defendant] gave a second statement on June 1, 2009, with his attorney at that time present. In this statement, [the co-defendant] "just wanted to let us know that he was just there to rob [the victim] and he wanted to rob him of his drugs and money." [The co-defendant] told Sergeant Mullins that, from this robbery of the victim, he received two hundred dollars.

. . . .

Lieutenant Caroline Mason with the MPD testified that she was assigned to the homicide division and was the case coordinator for the investigation into the death of the victim on April 25, 2009. After she arrived at the scene on the evening of the incident, she met with a few female witnesses. She learned the next day that [the petitioner] had given a statement that he was with his girlfriend, Chasity, when the victim was killed. Lieutenant Mason then met with Chasity, who told her that she "did see [the petitioner] the night . . . that the incident occurred later after it occurred, and he had shared with her some of the things that happened on the scene, his involvement." Lieutenant Mason stated that, initially, Chasity was not entirely truthful but that she eventually was forthcoming. Chasity told her that [the petitioner] "sold fake drugs on the street."

Lieutenant Mason identified an advice of rights form signed by [the petitioner] on April 29, 2009, during an interview for which she was present.

During the course of this interview, [the petitioner] admitted to being present when the victim was killed. He told Lieutenant Mason that the victim walked from the front of the house, along the left side, to the back of the house. [The petitioner] also informed her that a .38 revolver was used in the shooting. Additionally, some cash was taken from the victim, and the victim's pockets were turned inside out. The victim's keys, wallet, and cigarette lighter initially were taken but were "thrown down after the incident." [The petitioner] admitted to his involvement in planning the robbery of the victim. He also "was concerned about wearing a mask and being identified."

Lieutenant Mason also identified an advice of rights form signed by [the co-defendant] on May 1, 2009, and confirmed that she was present for this interview, even though she did not sign the form. [The co-defendant] told her that his nickname was "Lulu Man" because "[h]e was known for selling fake drugs." Shortly after this interview, [the co-defendant] was charged in this case. Lieutenant Mason identified a document dated May 3, 2009, indicating the release of the victim's vehicle and keys to the victim's family members.

On cross-examination, Lieutenant Mason acknowledged that the first time [the petitioner] met with police he did so voluntarily. She was not present for this first interview but was present for the second interview. She identified her supplement from this interview in which she wrote detailed notes about what transpired. During this interview, [the petitioner] explained that the reason he was present when the victim was shot was because he was there to buy some powder cocaine. He also denied receiving any money as a result of the robbery.

. . . .

Dr. Karen Chancellor, Chief Medical Examiner for Shelby County, testified as an expert in forensic pathology. She identified her autopsy report of the victim in this case. From her report, she explained that the victim's upper clothes were blood-stained. She found a gunshot wound on the left side of the victim's chin and ultimately discovered the bullet in the back of his neck. . . .

She explained that, after the victim was shot, "[h]e most likely would not have had any voluntary movements and purposeful movements." Accordingly, it was unlikely that he could have taken any steps after getting shot. She identified a photograph of the bullet she retrieved from the victim's

neck. Dr. Chancellor discovered, through her toxicology analysis, that the victim had a blood alcohol level of approximately .02. She also found the "active" and "breakdown product" of marijuana in the victim's bloodstream. Her ultimate conclusion was that "[t]his death resulted from a gunshot wound to the chin . . . that damaged the spinal cord. The manner of death was homicide."

. . . .

Taurus Whitmore testified that on April 27, 2009, [the petitioner] informed Whitmore that he had a pistol for sale. The two of them went over to the house of another individual, Demarcus Kinner, to sell the weapon. He described the pistol as a black ".357." He identified his previous testimony in which he also stated that the gun was a "Smith and Wesson." Once they reached Kinner's driveway, Kinner purchased the gun for approximately forty to fifty dollars, and then Whitmore and [the petitioner] drove away. After selling the gun, [the petitioner] told Whitmore that "[h]e made a mistake. He killed someone and he messed up." He also told Whitmore that he robbed the individual and, as a result, received $700.

On cross-examination, Whitmore did not recall telling detectives that the gun was a "chrome 9 millimeter." He denied that anyone else was with [the petitioner] when they went to sell the gun. He did not remember previously testifying that another individual was with [the petitioner]. He recalled that [the petitioner] told him that he shot the victim.

Demarcus Kinner testified that, in early May 2009, he received a call from Whitmore about a gun for sale. When Whitmore and [the petitioner] arrived, Kinner met them at their vehicle because he did not want to make the transaction in the house, where his wife was. While they were making the sale, Kinner asked [the petitioner], "[I]s this dirty," meaning "if any bodies [were] on it," but [the petitioner] told him "Nope." Kinner explained that he bought this gun as "family protection" because he and his wife had recently moved to a new neighborhood.

Eventually, police officers came to his house and asked him whether he had "bought anything," which he denied several times until finally admitting that he had bought a gun. They requested the gun, and Kinner complied. He described the gun as a .38 and said that it did not have any bullets in it when he purchased it.

Officer Ruth Horne with the MPD testified that she was a crime scene officer in April 2009. On May 2, 2009, she responded to 973 Echols to take photographs and collect evidence. She collected a .38 revolver from under a mattress of a bedroom in that residence. Officer Horne confirmed that five bullets were in the chamber at the time that they found the gun. Accordingly, they removed the bullets and turned both the gun and bullets in to the property room.

Special Agent Cervinia Braswell with the Tennessee Bureau of Investigation ("TBI") Firearms Identification Unit testified as a firearms identification expert. She explained that, when a semiautomatic pistol is fired, a cartridge automatically ejects from the gun. However, when a revolver is fired, the cartridge stays inside the gun until manually removed. Therefore, cartridge cases from a revolver may not be found at the scene of a crime.

Special Agent Braswell confirmed that she inspected a revolver and bullet fragment related to this case. She described the gun as a Taurus .38 Special revolver that holds six cartridges. As part of her testing, she fired the revolver and compared the fired bullet to the bullet fragment removed from the victim's body and determined that the bullets were fired from the same revolver. In her opinion, the bullet used to kill the victim was fired through the revolver she inspected.

At the conclusion of the State's proof, the defense for both [d]efendants moved for judgments of acquittal, and the trial court denied both motions. [The petitioner] chose not to testify, but his counsel called three witnesses on his behalf.

Gabriel King, [the petitioner's] father, testified that he was a close friend of the victim in this case. He was not aware of any animosity between the victim and [the petitioner]. On the day the victim was killed, King had been incarcerated for five years. Therefore, he did not know exactly what happened on that day. On cross-examination, King acknowledged that he and the victim both sold drugs.

Kenneth Swift testified that, prior to his incarceration, he lived with his girlfriend, Bessie. He remembered seeing [the petitioner] on the morning of April 25, 2009. Swift stated that he stayed on the front porch most of the day. He believed that he would have heard any conversation taking place in

the front yard.  At no point did he remember [the petitioner] talk about robbing the victim.

Swift stated that, after the incident, officers questioned him for approximately five hours, and he never changed his story that he had not heard [the petitioner] discuss robbing the victim.

On cross-examination, Swift stated that he did not see [the co-defendant] on the day of the incident until approximately 10:30 that evening. That was around the time that they heard a gunshot, but [the co-defendant] was not there at the exact time they heard the gunshot.  He denied telling the officers that he theorized the [d]efendants "had plotted up to do something" to the victim.  He agreed that he saw [the co-defendant] come into his yard approximately one hour after hearing the gunshot.

Swift identified his signature on a statement typed by police officers on April 28, 2009.  He denied, however, telling the officers what he allegedly said in the statement.  He admitted that he had sold drugs in that area as well.

Delores Grandberry, [the petitioner's] grandmother, testified that she treated the victim like her own son.  At the time of the victim's death, Delores had a home on Shasta that she was remodeling.  Her main residence was elsewhere during the remodel, but she spent a lot of time at her home on Shasta.  She never was aware of any animosity between the victim and [the petitioner].

Following Delores' testimony, the defense for [the petitioner] rested, and the defense for [the co-defendant] began.  [The co-defendant] testified that he turned himself in to police on April 27, 2009.  He denied killing someone during the course of a robbery.  He stated that he turned himself in because his sister had informed him that police were looking for him.

When he first began speaking with police officers, he denied any involvement in the murder of the victim because he had promised [the petitioner] that he would not say anything to police.  He acknowledged reading and signing an advice of rights form, waiving those rights.

On May 1, 2009, he was arrested at a shopping mall and again brought in for questioning.  At that time, [the co-defendant] decided to tell police of his involvement.  He denied having any involvement in killing the victim. His intention was to steal the victim's "stash" after the victim left the house.

On the day of the killing, he arrived at Bessie's house at approximately 5:30 p.m. Several individuals were present, including [the petitioner], the victim, and Swift. [The co-defendant] had known the victim for approximately thirteen to fifteen years, and, in that time, the victim always had sold drugs. He also stated that others called him ([the co-defendant]) the "Lulu Man" because he sold "bad drugs."

On the evening of the shooting, the victim left the area about the time that it got dark. [The petitioner] approached [the co-defendant] and asked [the co-defendant] for a disguise to steal the victim's drugs from his house while he was gone. [The co-defendant] retrieved a jacket from Bessie's house for [the petitioner] and said that he would accompany [the petitioner].

The [d]efendants went in the victim's house to look for his "stash" but could not find it. At some point, approximately thirty minutes later, they looked out the front window of the house and observed the victim "dealing with somebody on the street." The victim then walked to the back of the house. Soon thereafter, [the petitioner] walked out the front door. [The co-defendant] stayed inside and heard a gunshot. He was nervous because he did not know who had fired a gun, and he was not aware that [the petitioner] had a gun at the time. Eventually, [the co-defendant] walked out the back door and observed [the petitioner] "standing over [the victim] crying, saying man I think I done killed him. . . . He said yeah I think I messed up. I done killed him, man."

[The petitioner] asked [the co-defendant] not to tell anyone, and [the co-defendant] agreed. As they fled the scene, [the petitioner] handed [the co-defendant] $200 obtained from the victim's person. [The co-defendant] denied discussing this robbery earlier in the day. Instead, he insisted that this incident was not planned. On cross-examination, however, he identified his statement to police that the [d]efendants had discussed robbing the victim on several different occasions prior to the day of the incident.

On cross-examination by [the petitioner's] counsel, [the co-defendant] agreed that Bessie's son was approximately 5'6"" tall and that [the petitioner] was approximately 6'2"" tall. He acknowledged that he was the only person who identified [the petitioner] as being in the victim's house that evening. He denied ever in his life having a gun.

The defense for [the co-defendant] rested, and the State called rebuttal proof. Christy Lane, employed through Shelby County, testified that [the co-defendant] pleaded guilty to aggravated robbery in 2004, which included the use of a handgun.

Following the conclusion of the proof, the jury deliberated and found the [d]efendants guilty of first degree murder in the perpetration of a robbery. The trial court sentenced the [d]efendants to life imprisonment.

*Calvin Person*, 2013 WL 5883796, at *1-12 (footnotes omitted).

## II. Post-Conviction Hearing

The petitioner filed a timely petition for post-conviction relief, alleging the ineffective assistance of trial counsel. Specifically, the petitioner argued trial counsel failed to: (1) "meet with [the] [p]etitioner and keep him informed of the evidence against him;" (2) "meaningfully investigate, present, or challenge witnesses;" (3) "file motions on the [p]etitioner's behalf or to object to inadmissible evidence at trial;" and (4) "move for a severance from his co-defendant." The post-conviction court held an evidentiary hearing to address the allegations during which trial counsel and the petitioner testified.

Trial counsel stated he was appointed to the petitioner's case and represented the petitioner for approximately two years. During that time, trial counsel visited the petitioner in jail twelve or thirteen times and met with the petitioner during seventeen court appearances. Trial counsel reviewed the discovery with the petitioner, noting "the initial discovery was only like 50 pages," and the State provided additional discovery approximately ten days before trial. Based upon the new discovery, trial counsel "tried to formulate some motions and things to file" and requested what he believed to be *Brady* material from the State. Trial counsel testified the late-provided discovery hindered the defense but did not recall if he made an oral motion for a continuance as a result.

Trial counsel detailed his defense strategy and its relation to the issues of severance and the petitioner's decision not to testify. In general, trial counsel planned to "point the finger at [the co-defendant] and say that [the co-defendant] was the person who had created this murder. [The petitioner] was just a teenager who [the co-defendant] asked to dispose of the weapon afterward." However, because the petitioner and the co-defendant gave statements incriminating one another, trial counsel explained "there were pros and cons" to severing the defendants. Thus, trial counsel weighed whether "it would be a better strategy to have the boogie man not really be there or whether it would be better to have [the petitioner and the co-defendant] tried together for purposes of *Bruton* and the

- 14 -

statements be excluded."[2]  Trial counsel stated he "explained *Bruton*" to the petitioner and discussed severance with the petitioner "[a]t length" during "at least three full jail visits." Ultimately, trial counsel filed a motion in limine opposing severance, noting "[i]t was definitely [the petitioner's] choice not to sever[].  And there was a strategic advantage to that."  Trial counsel stated he "won the motion and [the petitioner and the co-defendant] were tried together, which was our strategy."

The severance issue emerged again during trial.  Trial counsel stated that prior to trial, the co-defendant's counsel suggested the co-defendant would not testify.  Yet, on the fourth or fifth day of trial, the co-defendant decided "out of nowhere" to testify and his testimony "completely torpedoed both [d]efendants."  According to trial counsel, the co-defendant "frankly, stabbed [the petitioner] in the back right in the middle of trial by blowing the whole thing up."

After the co-defendant testified, trial counsel was given a recess during which he sought advice from other attorneys, all of whom were "of the opinion that we should sever[] and that was my recommendation."  Despite this advice, the petitioner chose not to sever. Trial counsel recalled the petitioner "had been in jail for two years.  He had been in trial for four or five days at that point and we were really close to the end and he wanted closure."  Trial counsel stated:

> The trial had gone fairly well up to that point.  Most of the damaging evidence against [the petitioner] that had been disclosed in discovery was not presented as evidence on the stand.  So it was a tough decision.  There were problems either way.  Based on how it's gone now obviously in retrospect I wish we had severed, but I think my comments are all on the record in trial about what my recommendation was and why.

Similarly, regarding the petitioner's decision not to testify, trial counsel explained the petitioner's decision "was all wrapped up in the severance issue.  And if [the petitioner] testified his statements could have been used in trial."  Trial counsel advised the petitioner against testifying, and the petitioner also made his own decision not to do so.  Trial counsel stated "a big part of the decision not to testify was to exclude the evidence of both co-defendants['] statements."  As such, trial counsel stated the petitioner "was never going to testify and we talked about it quite a lot."

During cross-examination, trial counsel stated the petitioner's case was his first, first-degree murder trial though he had handled other felony trials.  Trial counsel agreed

---

[2] *See Bruton v. United States*, 391 U.S. 123 (1968).

the only evidence which placed the petitioner and the co-defendant at the scene of the shooting were the statements each provided prior to trial. As such, trial counsel "wanted to keep the statements out." Regarding whether Sergeant Mullins provided a general overview of the petitioner's statement and the petitioner's involvement in the shooting, trial counsel recalled several jury-out hearings dedicated to tailoring Sergeant Mullins' testimony to comply with *Bruton* and the confrontation clause and stated Sergeant Mullins' testimony stayed "within the perimeters" of both. Additionally, trial counsel recalled successfully filing a motion to exclude evidence that the petitioner was involved in a separate robbery in the hours prior to the robbery at issue and noted the petitioner could have opened the door to this or other "bad evidence" had he testified during trial.

Regarding severance, trial counsel again stated it was part of the defense strategy to oppose severance in an effort to benefit the petitioner. Trial counsel discussed the strategy with the petitioner and the co-defendant's counsel, noting the decision "had been made a year in advance" of trial. However, when the co-defendant "changed [his] strategy in the middle of trial" and decided to testify, trial counsel raised the issue of severance with the trial court. According to trial counsel, the trial court agreed to give the petitioner a continuance at "anytime" and "when it was obvious that there was a problem again, [the trial court] was going to let us sever[] if we wanted. But that was not a decision that we made."

Regarding severance and the theory of criminally responsibility at issue in the petitioner's case, trial counsel stated:

> But when [criminal responsibility] is present there is certainly an argument that you want to argue the other person was more culpable. And I think that we did that. I think we did that fairly well. The jury in this case was out for about five and one-half or six hours.

> And I believe they were only thinking about whether or not to come back with a lesser verdict for [the petitioner] because [the co-defendant's] testimony was an absolute disaster and whether he was the gunman or not I think the jury believed that he was the gunman by the time he got off the stand.

Finally, trial counsel stated he reviewed this Court's opinion on direct appeal regarding the issue of severance,[3] noting, "I have a completely different memory of severance and when it was raised from what's articulated in that opinion."

The petitioner also testified. Prior to trial, the petitioner stated trial counsel provided him with a copy of the discovery and told him the discovery was not complete. The petitioner explained though he "seldom" saw trial counsel, they discussed severance and whether the petitioner should testify. According to the petitioner, trial counsel advised him against testifying because trial counsel "thought it would be in [the petitioner's] best interest for [him] not to take the stand" in order to keep the petitioner's prior statements out of evidence. The petitioner, however, "just wanted to clear [his] name."

Regarding severance, the petitioner stated he told trial counsel the co-defendant was likely to testify based upon what the co-defendant was saying in jail. As such, the petitioner did not feel "a sense of security going to trial with [the co-defendant] knowing that he was gone (sic) testify against me." Further, the petitioner stated:

> But I was informed that [trial counsel] said that he was working with my co-defendant's lawyer to try to have us tried together and that he thought that it would be best because of some agreement they had made that he wouldn't testify against me. And I guess that's when [ ] that decision was made for [trial counsel] I guess not to severance me.

After the co-defendant testified, the petitioner explained he wanted to sever but trial counsel made the decision "not to sever[] because of the agreement I guess he made with my co-defendant's lawyer." Additionally, the petitioner stated he also wanted to testify because the co-defendant "jumped up there and said a lot of stuff that was not true." The petitioner, however, continued to follow trial counsel's advice and did not testify.

The petitioner identified additional complaints against trial counsel regarding his defense. Specifically, the petitioner alleged trial counsel was deficient for failing to fully address the DNA evidence, Ms. Deal's statements, and the co-defendant's statements to Ms. Deal regarding the black hoodie. The petitioner also stated trial counsel failed to impeach Ms. Blaze and Ms. Perry and failed to address that the co-defendant owed the victim money, the co-defendant sold fake drugs, and the victim "used to sell fake drugs." The petitioner stated he discussed these concerns with trial counsel who explained the defense was to demonstrate the co-defendant was more culpable than the petitioner.

---

[3] On direct appeal, this Court determined: "The first time that [the petitioner] raised the issue of severance was in his motion for new trial. Thus, we find that his complaint is untimely and, therefore, waived. *Calvin Person*, 2013 WL 5883796, at *13. (citing Tenn. R. Crim. P. 14(1)(A)).

During cross-examination, the petitioner recalled that fingerprints were not taken in his case but did not recall whether trial counsel asked officers as to why. He did not recall trial counsel questioning Ms. Deal about whether she asked the co-defendant why he had her son's hoodie but did recall Ms. Blaze's testimony wherein she stated the petitioner made threats against the victim. The petitioner recalled giving a statement indicating that he witnessed the shooting of the victim, that a .38 caliber revolver was used, and that cash was taken from the victim. However, the petitioner did not recall telling officers that he helped plan the robbery of the victim. Instead, the petitioner explained he told officers "that everybody had talked about robbing" the victim.

The petitioner stated he and trial counsel discussed whether he would testify or not and the issue of severance, and the petitioner relied on trial counsel's advice regarding both issues. The petitioner recalled the trial court questioned him about these decisions and stated he told the trial court that it was trial counsel's decision that he not testify, and the trial court accepted that answer. The petitioner was surprised when the co-defendant testified because trial counsel and the co-defendant's counsel were coordinating their defenses in an effort to keep the petitioner's and the co-defendant's statements out of evidence. However, when the co-defendant decided to testify, the petitioner stated trial counsel was at a loss for words. The trial court stopped the trial, and after discussions with trial counsel, the petitioner decided to move forward with the trial. During re-direct examination, the petitioner stated he was arrested at age 20 and went to trial at age 22. He did not complete high school, was not familiar with the legal world, and relied primarily on trial counsel's advice.

Upon questioning by the post-conviction court, the petitioner stated he was provided the opportunity to decide if he would testify both prior to and after the co-defendant testified. Trial counsel expressed to the petitioner that the co-defendant "made [himself] look bad" and advised the petitioner against testifying. In choosing not to testify, the petitioner told the trial court he was relying on trial counsel's advice that "it was in my best interest not to testify."

After its review of the evidence presented, the post-conviction court denied relief, and this timely appeal followed.[4]

***Analysis***

---

[4] The petitioner filed a motion seeking to late-file a notice of appeal along with a notice of appeal. This Court granted the motion, in the interest of justice, and accepted the notice of appeal as timely.

On appeal, the petitioner contends the post-conviction court erred in finding he received the effective assistance of counsel at trial. Specifically, the petitioner argues trial counsel was ineffective for "failing to pursue a severance from the co-defendant," asserting that "[o]nce the co-defendant testified in a manner so detrimental to the defense, trial counsel had a duty to protect his client and failed in that duty." The State submits the petitioner has failed to meet the burden required of him, and therefore, is not entitled to relief, arguing trial counsel "made the strategic decision not to seek a severance before trial, and [the petitioner] himself told the court he did not want a severance after [the co-defendant] decided to testify." Upon our review of the record and the applicable law, we affirm the ruling of the post-conviction court.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations de novo, affording a presumption of correctness only to the post-conviction court's findings of fact. *Id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both

components of the inquiry if the defendant makes an insufficient showing on one." *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Here, the record indicates trial counsel represented the petitioner for approximately two years prior to trial during which he met with the petitioner numerous times both in jail and during court appearances. During these meetings, the petitioner and trial counsel discussed the discovery, the issue of severance, whether the petitioner would testify, and their theory of defense which sought to place the blame on the co-defendant. However, because the petitioner and the co-defendant provided statements incriminating one another, part of the defense strategy also included keeping the statements out of evidence. In an effort to do so, when "the State requested that the trial court consider severing the [d]efendants" at the outset of trial, trial counsel filed a motion in limine opposing severance. *Calvin Person*, 2013 WL 5883796, at *13. In the motion, trial counsel argued the petitioner and the co-defendant "were part of a similar scheme or plan, [] the [petitioner] [was] charged [as] a responsible party for [the co-defendant's] actions," and the State had waived its ability to sever for failure to provide timely notice. The trial court granted the petitioner's motion, and the joint trial began.

After the State closed its case-in-chief, the petitioner presented his defense before the co-defendant. In doing so, the petitioner chose not to testify and offered testimony from several witnesses. Before the co-defendant presented his defense, the trial court allowed the petitioner and trial counsel to confer, and the petitioner again chose not to testify and to continue with the joint trial. Trial counsel stated: "And I just want to state for the record, he has been advised. We talked about severance over the break, we've talked about the possibility of not being able to rebut [the co-defendant's] testimony." The trial proceeded, and the co-defendant testified as detailed above. *Calvin Person*, 2013 WL

5883796, at \*11-12. Subsequently, trial counsel discussed the issue of severance with the petitioner, and the petitioner again chose to continue with the trial.

In denying the petition, the post-conviction court determined trial counsel was not deficient for failing to sever the petitioner's case from his co-defendant, finding trial counsel "relied on legal strategy informed by investigation." We agree. As noted throughout this opinion, the record indicates trial counsel and the petitioner discussed the issue of severance both prior to and during trial. It is clear trial counsel made a strategic decision at the outset of trial to oppose severance in an effort to bolster his defense and limit the State's ability to present evidence of the statements made by the petitioner and the co-defendant. As part of this strategy, both the petitioner and the co-defendant had agreed not to testify which was also to the petitioner's benefit because it precluded the State from impeaching the petitioner with his prior criminal record. The petitioner agreed with this strategy and proceeded with the joint trial, and nothing in the record indicates trial counsel was deficient in pursuing this strategy. However, the record also indicates trial counsel and the petitioner had to reassess the defense strategy regarding severance after the co-defendant testified and implicated the petitioner in the robbery. In doing so, the trial court provided trial counsel and the petitioner with an opportunity to discuss whether to move forward with the trial. According to trial counsel, he conferred with other attorneys and advised the petitioner to pursue severance. However, the petitioner decided against pursuing severance. The trial continued, and the petitioner was convicted of first-degree felony murder. While the post-conviction court did not directly accredit the testimony of trial counsel over that of the petitioner, based on the court's ruling resolving the factual dispute in favor of trial counsel's testimony, we can infer the accreditation of trial counsel's testimony, and nothing in the record preponderates against the factual findings of the post-conviction court. *See Tidwell*, 922 S.W.2d at 500.

As such, the record indicates trial counsel tailored his advice regarding severance to the demands of the trial, and the petitioner ultimately chose not to sever. Though trial counsel testified at the evidentiary hearing that "obviously in retrospect I wish we had severed," the petitioner has failed to overcome the presumption that, under the circumstances, trial counsel's severance strategy was not sound. *Strickland*, 466 U.S. at 689. Accordingly, the petitioner has failed to show that counsel's failure to independently move to sever was "so serious as to fall below an objective standard of reasonableness under prevailing professional norms," and the petitioner is not entitled to relief. *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter*, 523 S.W.2d at 936).

However, even if we were to conclude that trial counsel's representation fell below the constitutional standard, the petitioner has failed to demonstrate he was prejudiced by the alleged ineffective representation because the case against the petitioner was overwhelming even without the co-defendant's testimony. As noted by this Court on direct

appeal, "[h]ere, we not only have the accomplice testimony of [the co-defendant] implicating [the petitioner] in the robbery, but we also have the testimony of several other witnesses establishing [the petitioner's] intent." *Calvin Person*, 2013 WL 5883796, at *19. As detailed above, prior to the shooting, LaShawn Blaze heard the petitioner state that he planned to rob and kill the victim. *Id.* at 1, 19. After the shooting, the petitioner told Chasity Perry that he "had been at the vacant house on Shasta Street[,] . . . that 'a shot rang out,'" and that he "f***ed up," and told Mr. Whitmore that "[h]e made a mistake. He killed someone and he messed up." *Id.* at *3, 9. Furthermore, Lieutenant Mason testified regarding the petitioner's statement wherein the petitioner admitted he planned to rob the victim, the victim's pockets were turned inside out and cash was taken from the victim, a .38 revolver was used in the shooting, and to being present when the victim was killed. *Id.* at *8. The evidence also showed the petitioner sold the .38 revolver used to kill the victim after the crime. *Id.* at *10. Therefore, the petitioner has not established a reasonable probability that, had trial counsel moved to sever following the co-defendant's testimony, the outcome of the trial would have been different. *Strickland*, 466 U.S. at 694. The petitioner is not entitled to relief.

## *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE

- 22 -